The **DAHLEM FOUNDATION, INC.,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 17646.

United States Court of Appeals
Sixth Circuit.

Dec. 13, 1968.

As Amended April 23, 1969.

---

**994**

Louis E. Ackerson, Louisville, Ky., for appellant, William A. MacKenzie, Jones, Ewen, Mackenzie & Peden, James W. Hendricks, Louisville, Ky., on the brief.

Marco S. Sonnenschein, Dept. of Justice, Washington, D. C., for appellee, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief, Ernest W. Rivers, U. S. Atty., Louisville, Ky., of counsel.

Before O'SULLIVAN, Circuit Judge, and CECIL and McALLISTER, Senior Circuit Judges.

McALLISTER, Senior Circuit Judge.

This case presents the question of whether undistributed net earnings of a corporation were subject to the assessment of the Internal Revenue tax of 27½% for unreasonable accumulation of profits under the provisions of Title 26, U.S.C.A., Secs. 531 et seq. The District Court held that the accumulation of earnings was unreasonable and that the corporation had failed to prove that its retention of such earnings was not for the purpose of avoiding income tax; and the corporation appeals.

Appellant corporation was incorporated in 1947 with an initial capitalization of $37,000 which represented, principally, the cost of some undeveloped real estate in Louisville, Kentucky. The stock of the corporation was closely held: Mr. Joseph C. Dahlem holding 4,200 shares, or 92% of the voting stock, and his son, Bernard A. Dahlem, holding 350 shares, or 8% of the voting stock. Of the other stock, Mr. Joseph C. Dahlem held 13,308 shares, or 67%; his son, Bernard A. Dahlem, held 6,384 shares, or 32%, and Sebastian V. Dahlem, a brother of Joseph C. Dahlem, held 104 shares, or 1%.

The business purposes of the corporation were the development of real estate, the building of stores and apartments, and the leasing of the improved property to various tenants. The corporation sought to purchase additional tracts of unimproved land, from time to time, for the purpose of developing such property and leasing it. Some of the corporation's ventures were successful; others were not. Its net income, after taxes, for the fiscal year ending March 31, 1960, was $19,453; for the fiscal year of 1961, it was $20,283, and for the fiscal year of 1962, it was $17,417. This is the entire income involved in this case.

Appellant corporation filed income tax returns for each of the foregoing three years and paid the income tax shown to be due on each of the returns. None of this income for the three years above mentioned was distributed to the stockholders.

Thereafter, deficiencies in income tax were assessed against the corporation for each of the three years on the ground that the corporation had been availed of for the purpose of avoiding income tax with respect to its shareholders.

As above stated, because the income of the corporation for the three years in question was not distributed, the corporation was subjected to an assessment of 27½% on the ground that the income was an unreasonable accumulation of profits.

On the first day of each of the fiscal years involved in this litigation, appellant corporation had working capital of $62,370, $67,462 and $98,307 respectively.

The issue presented by this case is whether the corporation was availed of for the purpose of avoiding income tax on its shareholders by permitting its earnings to accumulate instead of being distributed as dividends.

The pertinent sections of the Internal Revenue Code (Title 26 U.S.C.A.) are:

Section 531, which provides for a penalty in the amount of 27½% of the accumulated taxable income not in excess of $100,000.

Section 532, which provides:

"Corporations subject to accumulated earnings tax

(a) General Rule.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

Section 533, which provides:

"Evidence of purpose to avoid income tax

(a) Unreasonable accumulation determinative of purpose.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

Section 537, which provides:

"Reasonable needs of the business

For purposes of this part, the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

It is contended by appellant corporation that the District Court finding that the corporate taxpayer was availed of for the purpose of avoiding income tax on its shareholders, by permitting earnings to accumulate instead of being distributed, was not supported by the evidence.

Appellant submits that the earnings and profits were not permitted by the corporation to accumulate beyond the reasonable needs, including the reasonably anticipated needs, of the corporation.

The evidence discloses that appellant has continued a fairly modest real estate operation that has been successful, has expanded and grown, has been conservatively managed, and has secured funds from its earnings for the developments in which it has participated. It appears further from the evidence that banks will not loan money to such corporations on undeveloped land, and that, in order to carry forward its objectives of developing real estate, it is necessary to accumulate cash in order to buy appropriate building sites.

It is pertinent to observe what appellant corporation was doing during the

three fiscal years in question, ending March 31, 1960, March 31, 1961, and March 31, 1962, as far as carrying out its business purposes.

At the stockholders' meeting of June 15, 1959, which was within the fiscal year ending March 31, 1960, the minutes showed that "Bernard A. Dahlem moved that in view of our commitment to spend up to $75,000, made in our lease with Mr. Austin Pryor that we dispense with the payment of any dividend at this time as we have a sufficiency of cash available to finance the construction of the Frisch's Big Boy without having to borrow." This motion was carried. It appears that appellant paid the foregoing amount of $75,000 by three payments of $25,000 each: one in January 1959, one in May 1959, and the last in August 1959. At the time of the stockholders' meeting on June 15, 1959, above referred to, appellant had paid $50,000 to finance the construction of the Big Boy building, and after June 15, 1959, had paid the balance of $25,000 in August 1959. Appellant corporation had, therefore, paid out in cash $50,000 for the Big Boy building during the fiscal year ending March 31, 1960. The foregoing is evidence of spending, on one project, a large sum of money in one of the taxable years, by this comparatively small corporation, in carrying out its business objectives; but, asks the Government, why, after paying out the sum of $50,000 during the fiscal year ending March 31, 1960, did not the corporation distribute all its earnings on that date to its stockholders? This would be a pertinent question if the only business objective which the corporation had was to pay for the purchase of the property in question. But appellant corporation was still in business, and its objectives continued to be the purchase and development of real estate, the building of stores and apartments, and the leasing of improved property to various tenants. Yet, the Government contends that as of March 31, 1960, all earnings then in the hands of the corporation would necessarily have

to be distributed to the stockholders or the corporation would be penalized by a tax assessment of 27½% in addition to the regular corporate income tax which it paid.

We may observe what further the corporation was doing during the fiscal years of 1959 and 1960. At the annual directors' meeting of June 15, 1959, the directors discussed the purchase of two specific parcels of real estate adjoining the Indian Trail Shopping Center for a total purchase price of $70,000 and, as subsequent minutes of the directors' meeting reveal, Mr. Walter Wagner, Jr., a realtor, was actually employed to make offers for these specific pieces of real estate. It appears that the realtor had been successful in persuading the owner of one of the parcels to sell, but that the other owner was unwilling, and the realtor advised the directors that it might take more money than anticipated to acquire this other piece of property but that he was continuing his efforts on behalf of the corporation. At the meeting, Mr. Joseph C. Dahlem advised that he had offered $3,000 an acre for the two acres "fronting on Indian Trail," but that the owner had refused such offer and was preparing to counter the offer. Mr. Dahlem also reported, according to the minutes, that he had obtained an option for fourteen acres at $75,000, on which to erect an office building for Ford, Bacon & Davis of New York but that the latter firm had not responded to appellant's proposition.

It is interesting to observe the background of the Ford, Bacon & Davis Company "deal," and its consideration of Louisville, Kentucky, as the headquarters of the company. Appellant and others in Louisville were interested in the proposition from the standpoint of benefit to the community. Appellant corporation was approached first by Vice President Craig of the Louisville Gas and Electric Company, who appeared to have no personal interest in the matter but was engaged in promoting the venture solely

for the benefit of his city. He had gone to New York in an endeavor to have Ford, Bacon & Davis build their headquarters in Louisville. Mr. Joseph C. Dahlem, as a result, had met with the representatives of the New York firm on a number of occasions. These representatives had come to Louisville, approved the site of the proposed building, and worked with appellant on the plans, informing appellant of all of their requirements. Appellant corporation had never had any specific agreement to erect the building as the matter was proceeding through its preliminary stages, but, as Mr. Dahlem testified, appellant corporation "thought we had the deal." And it was an important project. It consisted of an office building for 600 engineers of the New York firm, which was engaged in worldwide activities in advising foreign countries as to their construction needs, building dams, water supplies, and electrical plants for distribution to areas in those various countries. The firm was willing to make the move out of the high-rent district in New York and wanted 100,000 square feet on one floor. Appellant corporation drew the plans for the building, presented them to the representatives of the New York firm "and they kept coming in again and again and again, and they were very much interested.

"The bank—the Citizens Fidelity, got the Massachusetts Life Mutual Insurance Company in Cincinnati, to agree to lend us all of the money we needed to put up that building at five per cent.

"They were very cooperative to help Louisville get this Ford, Bacon, & Davis outfit in here because it meant a tremendous move because their men were making an average of $10,000 a year.

"It would have improved our economics tremendously and we offered the lowest deal, of ninety-six cents per square foot, so it meant not one penny to me.

"The Dahlem Construction Company would forego its entire profit in it. We felt like it was a good community deal.

"We had it so planned that we would set it up so that it would amortize itself over the term of the Ford, Bacon & Davis lease and if there was nothing left at that time, so much good for Louisville would have happened and that's the way we set it up because it would be self-sustaining and a non-profit organization."

But appellant corporation never was "able to make the deal," as Mr. Joseph C. Dahlem testified. It appeared, according to Mr. Dahlem, that the New York landlords of Ford, Bacon & Davis "saw that it was necessary to deal with them and I think they made them a deal so attractive that they couldn't move here."

It appears that appellant carried on the negotiations with reference to the two parcels of land adjoining the Indian Trail Trading Post, heretofore mentioned, during all of the tax years in question. Appellant made a specific offer for one of the parcels in July 1962, when it offered the owner $32,000 which was rejected. The efforts to acquire specific parcels of property near Indian Trail for stated sums were still continuing in May 1963, when Mr. Roberts, a realtor, was authorized to offer a total of $100,000 for three specific tracts: $30,000 for one tract, $50,000 for another, and $20,000 for the third tract. The efforts to purchase these tracts were unsuccessful.

Less than a month later, on July 7, 1963, appellant made specific plans for the purchase of property on Brownsboro Road; and on July 11, 1963, purchase of that property was authorized for $120,-000 in cash, and the land was bought for that sum. Money was thereafter borrowed to erect stores, banks and other buildings. As heretofore observed, money cannot be borrowed on ground alone, but after the ground has been purchased and leases procured, the banks will loan money for development.

During the tax years in question appellant corporation was faced with the question of accumulating large funds because of its concern that two of its best lessees, Kroger and Woolworth, might not renew their leases without substantial expenditures for remodeling and renewal, if, in fact, they would renew the leases at all. A few years before the tax years in question, Kroger had renewed its lease for a period of only five years. Woolworth's lease expired in April of 1962. Both stores had suffered a substantial decline in volume which led not only to a substantial decline in the rent received from those stores by appellant, but naturally led to the apprehension that Kroger and Woolworth might seek better locations instead of renewing their leases. Appellant's concern in this regard is shown by the following excerpts from the corporate minutes of May 27, 1960:

"It was pointed out by Bernard A. Dahlem that with our new Kroger lease now in effect at a lower rental rate, we can anticipate $10,000 to $15,000 less annual rent from them this coming year. Woolworth's business is down too.

"Joseph C. Dahlem noted that Woolworth's lease expires in April, 1962, and that Kroger would only renew their lease with us for five years. It, therefore, appears that we can anticipate substantial expense in the demolition of the apartment house in the near future to provide additional parking facilities for our tenants.

"Upon motion duly made, entered, seconded, and unanimously carried, it was declared to retain the cash in the business and not declare any dividends at this time."

This problem continued into the next year as shown in the minutes of June 7, 1961, which stated:

"Mr. Bernard A. Dahlem notes the combined rent received from Kroger, who have been our main source of income, for 1959 was $49,468, and for 1960 was $43,775, and for 1961 was $31,069."

In this regard, Mr. Dahlem was asked on the trial:

"Q. In other words, a decrease of $18,000 in that three-year period?

"A. Yes, sir.

"Q. Go ahead.

"A. (Continuing reading) and also that the report of Kroger sales so far this year, indicates that Kroger and Woolworth rent will total around $27,000 to $28,000 for this year. * * *

"The President notes that our lease with Woolworth expires in April, 1962. He said that no discussion has yet occurred between the Company and Woolworth regarding the renewal of the lease however, he does anticipate that Woolworth will want certain things done for them as an inducement to renew. In the event that Woolworth does not renew there would also be a considerable expenditure involved to remodel the building so as to be suitable to a new tenant."

In the corporate minutes of June 5, 1962, the following appears:

"Mr. Bernard A. Dahlem moved that since we had not yet heard from Woolworth with regard to their intentions on Preston Street, that we should again forego the cash dividend at this time. Seconded by Sebastian V. Dahlem. Carried."

Several years before the tax years in question, upon the renewal of the Kroger lease for only five years, the Kroger Company itself spent in excess of $85,000 in remodeling in return for a reduction in rent. In discussing this formal lease renewal, Mr. Dahlem testified:

"Q Mr. Dahlem, there has been considerable testimony about the possibility of having to rebuild the Woolworth Store or to fix it up for them

by modifications and so forth at the end of the lease in order to get it renewed.

"Let's talk about the Kroger Store. Now, you have told us that you—you just told Mr. Sama a few minutes ago about reducing the rent. Would you tell us about the negotiations for spending money on the Kroger Store and that condition of renewal when you were talking about the rent; how did that deal work out?

"A. Well, when the original lease expired a whole team of vice presidents and everybody else come down to negotiate that deal because at one time they had offered me a hundred thousand dollars just to get rid of that one and three quarters and put it on a one per cent and I said 'Well it was a good deal at the time we made it and if I won my battle then I should enjoy it.'

"So, when the lease expired I knew I was in for it and there was going to be a negotiation, but they still had a good location; still had a good business.

"So, I agreed to cut it a half of one per cent to one and a quarter per cent and let it run for another five years at which time I would automatically let them renew it at one per cent.

"Well, before that lease expired then they wanted me to make some repairs and remodeling and everything else inside the store and I said, 'No, not at one per cent. If you will put it back the way it was, why fine, I'll spend a hundred thousand dollars, but under this condition when you are paying one per cent, why, we will fix up whatever has to be done on the outside and what has to be done on the inside is your problem.'

"Well, they come back and agreed to it so that's where it is now.

"Q. So, this work you had discussed with the Foundation, the Founda-tion didn't have to do it. Is that correct?

"A. Well, we didn't have to do it, but meanwhile we prepared and we thought we were going to have to spend sixty-five or eighty thousand or maybe a hundred thousand, because the ideas of merchandizing change and they gut the store and they pull out the fixtures and relocate all the fixtures and iceboxes and all of your drain lines have to be reinstalled and your electrical outlets are reinstalled and in fact, frankly, you do a whole new renovating job of between $25,000 and $30,000, just in the mechanical alone.

"Q. Well, to get specific here, instead of you having to expend this, the Kroger Company went ahead and did it because you reduced the percentage of rent; is that correct?

"A. That is right.

"Q. Now, do you know approximately what the cost was that they had to spend?

"A. I don't know what it cost, but they told me they spent in excess of $85,000."

The general nature of the properties and activities of appellant, Dahlem Foundation, is seen in the following testimony of Mr. Joseph C. Dahlem, when he described, among other matters, how the value of certain properties adjacent to appellant corporation increased the value of appellant's own holdings:

"Q. Now, was the development of that property across the street of any benefit to the Dahlem Foundation?

"A. Oh, sure.

"Q. Would you tell the Court why, please?

"A. Well, everything is—I mean it's just one continuous deal out there. I mean it's just like one big shopping center with the hospital across the

street and the bank and it is all separated by just Preston and Shelby and Eastern Parkway and Minoma Streets that are feeders and they just bring all that traffic in, but it's got everything there when you add them all up. It is a tremendous shopping center in itself because it has so many varieties of everything.

"Q. So whatever the exact arrangement was this of benefit to the Dahlem Foundation to help provide some of this financing?

"A. Absolutely, or we wouldn't have done it. We would have got rid of the property, but we wanted to keep that property."

None of the plans heretofore mentioned for expansion, or any of the problems or contingencies with which the corporation was faced are disputed, except that the Government contends that the plans were not specific plans or certain plans.

Appellant, as stated, was in the business of owning, operating and developing shopping centers and other real estate. The record contains many excerpts from the corporate minutes of appellant corporation's meetings showing that it was continually seeking additional parcels of real estate to acquire and develop; and that vacant land was to be acquired only by appellant's paying cash for it. It was only after the ground was purchased and paid for that appellant was able to borrow money to erect improvements on the property.

Appellant corporation claims that its earnings and profits were not permitted to accumulate beyond the reasonable needs, including the reasonably anticipated needs of the corporation.

The Government contends that the criterion to be followed is whether earnings and profits were accumulated for carrying out specific and definite plans; and it is submitted that if the plans were not specific and definite, then the accumulation of earnings was beyond the reasonable needs or reasonably anticipated needs of the corporation, and are consequently subject to the $27\frac{1}{2}\%$ tax in addition to the regular income tax.

The Government advances certain other contentions as proof that the corporation never had any specific plan with reference to negotiations for the property mentioned for the Ford, Bacon & Davis "deal." The Government insists that while Mr. Joseph C. Dahlem, according to the minutes of the directors' meeting of the corporation on May 27, 1960, advised that he had obtained an option for the fourteen acres in question at $75,000, the plan was not specific and definite because neither Mr. Dahlem nor the corporation actually had a binding option.

That the corporation had no binding option to purchase the property in question for $75,000 may be conceded. But, in our view, this does not detract from the conclusion that the corporation was retaining its funds for such a purpose, and that this retention of funds was not an accumulation of profits for the reasonable and reasonably anticipated needs of the business.

What actually happened with regard to the so-called option and efforts to secure the property in question, and other properties, is somewhat complicated, but is explained by appellant's realtor, Mr. Walter Wagner, Jr., in his testimony as follows:

"Of course, the first thing that had to be done, we had to make sure this firm would come to Louisville. So, we weren't in a position to actually make an offer on the property, but I did get what we would call an 'I will take,' in other words, I had an option on the property.

"Q. And is this (indicating) the 'I will take'?

"A. Yes, sir; it is, for $75,000; that's right.

"Q. And was there any earnest money paid with that?

"A. No, sir. The contract called for a deposit to be placed, but the deposit would only have been put up if the Dahlem Groups were exercising the option. In other words, it worked in reverse.

"Q. I see; and that was dated April 11, 1960, I believe, your 'I will take'?

"A. That's—I believe that's correct.

"Q. Now did Mr. Proctor question you about the $500 deposit?

"A. He did. This gentleman, as I say, was from Morehead and of course, the contract did have the deposit written in there.

"Normally, if you make an offer on a piece of property you must put the deposit up then, but in this case it would only have been applied if the 'I will take' contract were exercised.

"Q. And that was the letter you wrote to him explaining that?

"A. Yes, sir.

"Q. And in that you told him that you believed that the deal was moving along well?

"A. Well, at this point we felt like this company had elected to come to Louisville and apparently this was a site that they had approved. So, it looked like it was going well.

"Q. Now, were you also employed to look at some property on Preston Highway, I believe it is called the Graves Property on which there has been testimony?

"A. Yes, sir. There was a piece then that was immediately adjoining Indian Trail Center to the south.

"Q. All right; and what happened in that transaction?

"A. Well, Mr. Dahlem asked me to go see Graves and to take them this offer and just for a point of clarification, sometimes we try to make offers for an undisclosed principal, but in this case we didn't see any reason to do it because we felt that Mr. Dahlem was the obvious purchaser and they might just as well know it.

"So I did go to them and Mr. Dahlem gave me an offer for $32,000, which was a net offer, which I took to them. I spent many hours with them, as a matter of fact. Mrs. Graves' argument was that she was happy living next to the shopping center and didn't care to move.

"Q. And what was the date of that offer?

"A. That was July 10, 1962."

Cross-examination

By Mr. Sama:

"Q. I think I understand what happened, Mr. Wagner, but just for clarification of this a little bit for me—

"A. (Interrupting) All right sir, surely.

"Q. (Continuing)—in regard to the Ford, Bacon, and Davis transaction?

"A. Yes, sir.

"Q. As I understand it you never actually paid for an option to buy property?

"A. No, we didn't, because whenever I can, if I am representing a client, I try to obtain what we in the real estate business will call an 'I will take' contract that merely means that the owner of the property says to me that, 'I will sign this contract and for so many days I will take this price for my property.'

"When we can do this without having to put up option money we do it this way.

"Q. But there would be nothing to keep him from selling to someone else?

"A. Well, he is bound by a contract. Now, we do this—we do this all the time in real estate circles now.

"Q. In regard to the other property you referred to?

"A. Yes, sir.

"Q. I guess it is the Preston Highway; is this the property owned by the Graves, $30,000?

"A. Yes, yes, sir.

"Q. Now again, in that you never actually paid for an option to buy the property?

"A. No, sir. We were trying, actually, to buy the property. We weren't asking for an option. That was merely an offer of purchase.

"Q. In other words, you went out there with a specific offer to buy it?

"A. That's right.

"Q. For 'X' number of dollars?

"A. That's right; for $30,000 as stated on that contract.

"Q. And Mrs. Graves, was it, declined to sell?

"A. Mrs. Graves did decline to sell. Mr. Graves would have sold it to us, but Mrs. Graves declined."

■ We see no reason for concluding from the foregoing that the corporate funds held for the purposes mentioned were not accumulations of profits for the reasonably anticipated needs of the corporate business.

We have above outlined the plans for expansion of appellant corporation and the contingencies with which it was faced from time to time during the taxable years, as a corporation whose business purposes were the purchase of unimproved land, the development of real estate, the building of stores and apartments and the leasing of the improved property to various tenants.

We have mentioned that the depreciation reserve of the corporation amounted to $68,669 on April 1, 1959, $78,662 on April 1, 1960, and $89,132 on April 1, 1961. The Government argues that the recognition of depreciation has no essential relation to the problem of replacement.

In Revenue Ruling 67–64, I.R.B. 1967–9, 13, it was held:

"Although the reserve for depreciation itself may be considered and given appropriate weight as a part of the facts and circumstances in considering the reasonable needs of the business, the concept that a non-cash deduction for depreciation based on historic costs requires the setting aside for an indefinite period a cash fund adjusted for economic fluctuations in order to provide for total replacement of plant assets is not within the meaning of the term 'reasonable needs of the business.'

"Accordingly, a corporation may not include a fund equal to its depreciation reserves escalated for the economic factor of increased replacements costs in justifying the reasonable needs of its business pursuant to section 537 of the Code. However, the reserve for depreciation itself may be considered and given appropriate weight as a part of the facts and circumstances in each case."

It is not contended by appellant corporation that the reserve for depreciation is the sole consideration supporting the taxayer's determination to keep its cash in the corporation for the needs of the business, but is an additional factor, among others heretofore mentioned, to be considered and given appropriate weight in the taxpayer's determination to keep its cash available.

It is also to be remarked that if all of the corporation's earnings and profits had been paid out in dividends, the corporation would have had inadequate reserves to purchase any of the land which it planned to purchase during the tax years in question and would have had entirely inadequate reserves to meet the contingencies of repairs and renovations for renewal of the properties it had leased to other companies.

It is emphasized by the Government that the corporation's purchase of the property on Brownsboro Road for ap-

proximately $122,000 in cash occurred on July 12, 1963, after the last taxable year here in question. But this expenditure for the land for the purpose of erecting a shopping center was an operation engaged in by the corporation in carrying out its objectives; and the fact that this largest single expenditure made by the corporation occurred subsequent to the last taxable year, was not evidence that the accumulation of this sum (and its expenditure for such a purchase) was an unreasonable accumulation of earnings beyond the reasonably anticipated needs of the business. For the business of the corporation was a continuous one and appellant was constantly on the alert during all the period in question with the serious and unquestioned purpose of purchasing property for the expansion of its business needs.

"Determination of the reasonable needs of its business is, in the first place, a task for the officers and directors of the corporation. What is reasonable in one situation may be unreasonable in a different context of facts. We should be hesitant to attribute a sinister or ulterior motive to the corporation unless such a factual situation clearly appears. The law contemplates that any legitimate business may grow if legitimate means be employed." Crawford Publishing Co. v. C. I. R., 17 T.C. 1404.

As has been said, a contingency is a reasonable need for which a business may provide if the likelihood of its occurrence reasonably appears to a prudent businessman. Smoot Sand & Gravel Corp. v. Commissioner of Int. Rev., 241 F.2d 197, 206 (C.A. 4).

If the Government's views were to be accepted, they would give to the Treasury virtually absolute power to stifle or encourage economic growth as it—not the corporate directors—would then decide how each company should handle its corporate and financial affairs. Electric Regulator Corporation v. C. I. R., 336 F. 2d 339, 346 (C.A. 2). In Hardin's Bakeries, Inc. v. Martin, Jr., 19 AFTR 2d 647 (S.D.Miss., 1967, published by Prentice Hall), a case similar to the controversy before us, Judge Cox, in an opinion holding that a corporation wasn't availed of to avoid payment of taxes on profits, said:

"It would have been helpful if some tangible plan had been prepared and approved for retaining such funds for some announced specific use, but that is not indispensible to a justification of the taxpayers' position here. * * * These prospective expenditures were not mere possibilities but were probabilities in future planning for the continued existence and expansion of these corporations, and the accumulated earnings of these corporations for these three years were not even adequate to meet said needs and requirements."

Judge Cox, in the above case, went on to state the weight to be given to the judgment of the corporate directors as follows:

"The business judgment of these experienced people as to their business requirements for the proper and safe and sound conduct of such businesses is entitled to great weight. The defendant offered no proof in this case but relied upon evidence and testimony elicited on cross examination."

Under the statute, the corporation was permitted to accumulate its profits and earnings for the reasonable needs and the reasonably anticipated needs of its business.

We are of the view that the evidence is clear and undisputed that the profits were accumulated for the reasonable needs and the reasonably anticipated needs of the corporation; and that the determination that the earnings and profits of the corporation were permitted to accumulate beyond the reasonable, and reasonably anticipated, needs of the business, is not supported by the evidence.

In accordance with the foregoing, the judgment of the District Court is reversed, and the case is remanded with directions to enter judgment for the appellant.