Walton Mill, Inc. (formerly Walton Cotton Mill Co.) v. Commissioner.
Walton Mill, Inc. v. Commissioner
Docket No. 697-70.
United States Tax Court
T.C. Memo 1972-25; 1972 Tax Ct. Memo LEXIS 233; 31 T.C.M. (CCH) 75; T.C.M. (RIA) 72025; January 31, 1972, Filed. Harry C. Howard and Jack H. Watson, Jr., 2500 Trust Co. of Georgia Bldg., Atlanta, Ga., for the petitioner. James D. Burroughs, for the respondent. 76 SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years and in the amounts as follows: Taxable year
ended Aug. 31
Deficiency
1964
$ 56,287.79
1965
151,199.88
1966
158,410.82
1967
237,646.86
*235 Petitioner in an amendment to its petition asserts that there was an overpayment for the taxable year ended August 31, 1965, in the amount of $2,007.19, for which it is entitled to a refund. The issues for decision are: (1) Whether, for each of the years in issue, petitioner was formed or availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, and is thus subject to the accumulated earnings tax imposed by section 531, I.R.C. 1954[1]
(2) Whether petitioner is entitled to a refund based upon additional investment credit claimed for the taxable year ended August 31, 1965. Findings of Fact Some of the facts have been stipulated and are found accordingly. Walton Mill, Inc., was incorporated pursuant to the laws of the State of Georgia on March 17, 1900, under the name of Walton Cotton Mill Company. On October 16, 1964, petitioner changed its name to Walton Mill, Inc. Petitioner's principal place of business at the time the petition was filed in this case was Monroe, Georgia. *236 Petitioner keeps its books and records on an accrual method of accounting and files its returns on a fiscal year ending August 31. It filed corporate income tax returns (form 1120) for the fiscal years ending August 31, 1964, to August 31, 1967, inclusive, with the district director of internal revenue, Atlanta, Georgia. Since its incorporation, petitioner has continuously operated as a primary producer of textile products - that is, it spins fibers into yarn, weaves such yarn into fabrics, and then sells such fabrics as "gray goods" primarily to other textile concerns, which for the most part finish and market such fabrics. Petitioner was originally formed by 13 individuals. George W. Felker, Sr., and Henry D. McDaniel were two of the original founders of petitioner. Edgar S. Tichenor, son-in-law of Henry D. McDaniel, became president of petitioner in 1908, and served in that position for 25 years after which time he was succeeded by his son Henry McD. Tichenor. During World War II, George W. Felker, Jr., became president of petitioner when Henry McD. Tichenor went into the Service. When Henry McD. Tichenor returned from Service he resumed his duties as president and George *237 W. Felker, Jr., became chairman of the board of directors. On June 22, 1962, George W. Felker III who had been a member of the board of directors since 1950 was elected president of petitioner and Henry McD. Tichenor became chairman of the board of directors. During the taxable years in issue, petitioner had authorized 5,000 shares of $100 par value stock, of which 3,500 shares were issued and outstanding. During its taxable years 1964, 1965, 1966 and 1967 petitioner's outstanding shares were held of record by 55, 56, 59, and 62 shareholders, respectively. During the taxable years 1964 and 1965 beneficial ownership of outstanding shares by the directors of petitioner was as follows: Shareholder
Shares
George W. Felker III
400.0
Hansford Sams, Jr.
0.0
Robert S. Sams
5.0
F. B. Warfield
10.0
Henry McD. Tichenor
728.5
Total
1,143.5 F. B. Warfield's wife owned 599 shares and the mother of George W. Felker III owned 260 shares during these years. Such shares beneficially owned by directors constituted approximately 33 percent of the outstanding shares. During the taxable years 1964 and 1965, the largest single stockholder was Henry McD. Tichenor, who died *238 on August 16, 1965. He beneficially owned 20.80 percent of the outstanding shares. During the taxable years 1966 and 1967, beneficial ownership of outstanding shares by the directors of petitioner was as follows: 77 Shareholder
Shares
George W. Felker III
400
Hansford Sams, Jr.
0
Robert S. Sams
5
F. B. Warfield
10
Total
415 Such shares beneficially owned by the directors constituted approximately 12 percent of the outstanding shares. During the fiscal years 1966 and 1967 F. B. Warfield's wife owned 270 shares and Felker's mother continued to own 260 shares. During the taxable years 1966 and 1967, Trust Company of Georgia was the largest single stockholder of petitioner. It held 1,394 1/2 shares, or approximately 40 percent of the outstanding shares in 1966, and 1,729 1/2 shares, or approximately 49 percent of the outstanding shares in 1967, in its capacity as either trustee under certain trusts or as executor or coexecutor of certain estates. Petitioner's comparative balance sheet for the taxable years ended August 31, 1959, to August 31, 1967, inclusive, is as follows: Assets
8/31/59
8/31/60
8/31/61
Cash
$ 254,188.40
$ 950,661.56
$ 274,798.57
Accounts Receivable
329,019.93
207,652.02
338,845.83
Inventories
842,092.73
865,557.01
1,764,328.70
Rents Receivable
2,360.30
2,285.21
Prepaid Interest
475.00
1,587.50
Prepaid Insurance
7,504.69
3,986.10
1,580.42
Fixed Assets (less depreciation)
1,887,751.78
1,672,827.85
1,683,462.45
Investments in Governmental
Obligations and Preferred Stock *
Land
Other Investments **
Total Assets
$3,323,392.83
$3,702,969.75
$4,064,603.47
Liabilities and Capital Assets
8/31/59
8/31/60
8/31/61
Funds Payable
$ 15,777.18
$ 20,675.69
$ 25,729.31
Notes Payable
150,000.00
445,000.00
Trade Accounts Payable
30,823.47
30,493.34
54,989.86
Accrued Expenses
79,678.24
200,844.66
93,385.01
Provision for Taxes
202,723.16
130,484.30
Reserve - Employees Pension
66,007.83
58,297.70
41,148.53
Capital Stock
350,000.00
350,000.00
350,000.00
Earned Surplus
2,631,106.11
2,839,935.20
2,923,866.46
Total Liabilities and Capital
$3,323.392.83
$3,702,969.75
$4,064,603.47
Assets
8/31/64
8/31/65
8/31/66
Cash
$ 590,639.57
$ 740,651.24
$ 418,601.56
Accounts Receivable
395,096.97
412,166.39
511,443.20
Inventories
501,321.00
787,166.30
760,605.65
Rents Receivable
Prepaid Interest
Prepaid Insurance
1,716.20
8,758.30
5,222.96
Fixed Assets (less depreciation)
1,518,981.63
1,657,156.33
1,701,971.40
Investments in Governmental
1,198,363.04
1,585,569.06
2,159,399.18
Obligations and Preferred Stock *
Land
31,453.52
30,277.11
27,673.78
Other Investments **
50,230.00
60,147.90
40,365.41
Total Assets
$4,287,801.93
$5,281,892.63
$5,625,283.14
Liabilities and Capital
8/31/64
8/31/65
8/31/65
Funds Payable
$ 20,568.42
Notes Payable
Trade Accounts Payable
30,101.41
$127,641.31
$ 47,153.46
Accrued Expenses
199,110.62
475,212.83
509,543.47
Assets
8/31/64
8/31/65
8/31/65
Provision for Taxes
$ 246,331.25
$ 392,000.00
$ 291,634.00
Reserve - Employees Pension
23,113.42
19,945.62
10,646.46
Capital Stock
350,000.00
350,000.00
350,000.00
Earned Surplus
3,418,576.81
3,917,092.87
4,416,305.75
Total Liabilities and Capital
$4,287,201.93
$5,281,892.63
$5,625,283.14
*239 Assets
8/31/ 2
8/31/63
Cash
$ 100,666.89
$ 284,764.60
Accounts Receivable
287,772.92
337,118.71
Inventories
1,595,468.46
1,144,902.22
Rents Receivable
Prepaid Interest
912.50
Prepaid Insurance
8,210.89
6,099.49
Fixed Assets (less depreciation)
1,628,494.05
1,390,924.56
Investments in Governmental
393,577.21
Obligations and Preferred Stock *
Land
37,561.61
Other Investments **
Total Assets
$3,621,525.71
$3,594,948.40
Liabilities and Capital Assets
8/31/62
8/31/63
Funds Payable
$ 22,981.88
$ 21,606.23
Notes Payable
100,000.00
Trade Accounts Payable
27,653.32
26,401.79
Accrued Expenses
89,301.46
94,218.48
Provision for Taxes
53,955.60
76,450.38
Reserve - Employees Pension
34,800.57
29,136.87
Capital Stock
350,000.00
350,000.00
Earned Surplus
2,942,832.88
2,997,134.65
Total Liabilities and Capital
$3,621,525.71
$3,594,948.40
Assets
8/31/67
Cash
$ 454,115.33
Accounts Receivable
440,994.14
Inventories
877,115.62
Rents Receivable
Prepaid Interest
Prepaid Insurance
1,275.76
Fixed Assets (less depreciation)
2,441,619.28
Investments in Governmental
2,304,334.21
Obligations and Preferred Stock *
Land
27,673.78
Other Investments **
29,280.07
Total Assets
$6,576,408.19
Liabilities and Capital
8/31/67
Funds Payable
Notes Payable
Trade Accounts Payable
$ 34,147.81
Accrued Expenses
703,649.58
Assets
8/31/ 7
Provision for Taxes
$ 354,695.00
Reserve - Employees Pension
8,993.36
Capital Stock
350,000.00
Earned Surplus
5,124,922.44
Total Liabilities and Capital
$6,576,408.19
*240 78 The following schedules represent the balance sheets of petitioner and its wholly owned subsidiary, Monroe Mills, Inc., for the taxable years ended August 31, 1968 to August 31, 1970, inclusive: August 31,
1968
Walton
Monroe
Elimina-
Consoli-
ASSETS
Mill
Mills
tions
dation
1. Cash
$ 29,187.45
$ 63,752.65
$ 0
$ 92,940.10
2. Trade accounts
529,563.53
144,955.87
0
674,519.40
receivable
3. Inventories
1,302.236.77
1,426,560.88
0
2,728,797.65
4. Investment in
147,692.62
0
0
147,692.62
municipal bonds,
preferred stock and
certificates of
deposit
5. Other current
51,342.11
81,393.63
0
132,735.74
assets
8. Investment in
954,645.60
0
954,645.60
0
subsidiary
9. Depreciable
4,838,383.28
1,157,340.63
0
5,995,723.91
assets
(a) Less
(2,229,812.65)
(300,560.76)
0
(2,530,373.41)
accumulated
depreciation
11. Land
28,678.40
12,000.00
0
40,678.40
12. Organization
0
1,699.85
0
1,699.85
cost
(a) Less
0
(1,076.56)
0
(1,076.56)
accumulated
amortization
13. Other assets:
14,549.50
0
0
14,549.50
Collateral deposit
Recoverable Federal
307,074.53
37,943.15
22,500.00
367,517.68
and state taxes
Inter-company
361,609.09
0
361,609.09
0
accounts
Intangible assets
0
0
214,705.66
214,705.66
14. Total assets
$6,335,150.23
$2,624,009.34
$1,079,049.03
$7,880,110.54
LIABILITIES AND
CAPITAL
15. Accounts
$ 113,484.44
$ 35,162.72
$ 0
$ 148,647.16
payable
16. Notes payable
75,000.00
975,000.00
0
1,050,000.00
17. Other current
81,943.27
36,699.53
0
118,642.80
liabilities: Taxes
- other than income
Wages and salaries
77,004.26
29,549.58
0
106,553.84
Contributions to
102,503.03
0
0
102,503.03
retirement trust
Other
25,302.48
13,809.13
0
39,111.61
19. Long-term notes
0
800,000.00
0
800,000.00
payable
20. Other
7,982.64
0
0
7,982.64
liabilities:
Reserve for
employee pension
fund
Inter company
0
361,609.09
361,609.09
0
accounts
21. Capital stock -
350,000.00
105,000.00
105,000.00
350,000.00
common
22. Capital surplus
0
75,000.00
75,000.00
0
24. Retained
5,501,930.11
192,179.29
537,439.94
5,156,669.46
Earnings
26. Total
$6,335,150.23
$2,624,009.34
$1,079,049.03
$7,880,110.54
liabilities and
capital
*241 August 31,
1969
Walton
Monroe
Elimina-
Consoli-
ASSETS
Mill
Mills
tions
dation
1. Cash
$ 215,316.68
$ 17,981.10
$ 0
$ 233,297.78
2. Trade accounts
970,246.89
409,211.78
0
1,379,458.67
receivable
3. Inventories
819,624.56
844,942.16
0
1,664,566.72
4. Investment in
52,201.10
0
0
52,201.10
municipal bonds,
preferred stock and
certificates of
deposit
5. Other current
$ 3,300.10
$ (242.37)
$ 0
$ 3,057.73
assets
8. Investment in
928,868.60
0
928,868.60
0
subsidiary
9. Depreciable
4,834,410.14
1,466,284.06
0
6,300,694.20
assets
(a) Less
(2,375,582.38)
(418,706,86)
0
(2,794,289.24)
accumulated
depreciation
11. Land
28,678.40
12,000.00
0
40,678.40
12. Organization
0
1,699.85
0
1,699.85
cost
(a) Less
0
(1,416.53)
0
(1,416.53)
accumulated
amortization
13. Other assets:
5,163.58
0
0
5,163.58
Collateral deposit
Construction in
0
154,157.46
0
154,157.46
progress
Inter-company
1,622,814.13
0
1,622,814.13
0
accounts
Intangible assets
0
0
200,857.23
200,857.23
14. Total assets
$7,105,041.80
$2,485,910.65
$2,350,825.50
$7,240,126.95
LIABILITIES AND
CAPITAL
15. Accounts
$ 98,876.69
$ 44,915.64
$ 0
$ 143,792.33
payable
16. Notes payable
90,000.00
0
0
90,000.00
Construction
0
120,000.00
0
120,000.00
contract payable
17. Other current
87,331.83
56,679.44
0
144,011.27
liabilities: Taxes
- other than income
Wages and salaries
71,884.39
32,689.22
0
104,573.61
Contribution to
132,872.10
0
0
132,872.10
retirement trust
State and Federal
175,250.00
0
0
175,250.00
income taxes
Other
26,227.24
11,876.63
0
38,103.87
19. Long-term notes
0
700,000.00
0
700,000.00
payable
20. Other
5,628.00
0
0
5,628.00
liabilities:
Reserve for
employee pension
fund
Inter-company
0
1,622,814.13
1,622,814.13
0
accounts
21. Capital stock -
350,000.00
105,000.00
105,000.00
350,000.00
common
22. Capital surplus
0
75,000.00
75,000.00
0
24. Retained
6,066,971.55
283,064.41
548,011.37
5,235,895.77
Earnings
26. Total
$7,105,041.80
$2,485,910.65
$2,350,825.50
$7,240,126.95
liabilities and
capital
*242 August 31,
1970
Walton
Monroe
Elimina-
Consoli-
ASSETS
Mill
Mills
tions
dation
Cash
$ 426,097.50
$ 78,024.40
$0
$ 504,121.90
Trade accounts
441,567.70
236,311.64
0
677,879.34
receivable
Inventories
899,610.56
1,068,038.23
0
1,967,648.79
Investment in
0
0
0
0
municipal bonds,
preferred stock and
certificates of
deposit
Other current
6,167.26
5,060.24
0
11,227.50
assets
Investment in
928,868.60
0
928,868.60
0
subsidiary
Depreciable assets
4,752,452.01
1,931,262.61
0
6,683,714.62
(a) Less
(2,621,091.23)
(536,780.95)
0
(3,157,872.18)
accumulated
depreciation
Land
34,178.40
12,000.00
0
46,178.40
Organization cost
0
1,699.85
0
1,699.85
(a) Less
0
(1,699.85)
0
(1,699.85)
accumulated
amortization
Other assets:
2,662,637.41
0
2,662,637.41
0
Inter-company
accounts
Intangible assets
0
0
190,285.80
190,285.80
Total assets
$7,530,488.21
$2,793,916.17
$3,401,220.21
$6,923,184.17
LIABILITIES AND
CAPITAL
Accounts payable
$ 50,946.30
$ 30,914.97
$ 0
$ 81,861.27
Notes payable
0
400,000.00
0
400,000.00
Construction
0
2,300.00
0
2,300.00
payable
Other current
81,060.97
56,770.20
0
137,831.17
liabilities: Taxes
- other than income
Wages and salaries
109,290.20
40,489.70
0
149,779.90
Contribution to
136,503.38
0
0
136,503.38
retirement trust
Other
26,092.03
14,670.13
0
40,762.16
State and Federal
228,000.00
0
0
228,000.00
income taxes
Long-term notes
0
0
0
0
payable
Other liabilities:
$ 1,390.31
$ 0
$ 0
$ 1,390.31
Reserve for
employee pension
fund
Inter-company
0
2,662,637.41
2,662,637.41
0
accounts
Capital stock -
350,000.00
105,000.00
105,000.00
350,000.00
common
Capital surplus
0
75,000.00
75,000.00
0
Retained Earnings
6,547,205.02
593,866.24
558,582.80
5,394,755.98
Total liabilities
$7,530,488.21
$2,793,916.17
$3,401,220.21
$6,923,184.17
and capital
*243 During its fiscal year ended August 31, 1965, the cash on hand and marketable securities owned by petitioner fluctuated from a low of $1,529,360 on November 27, 1964, to a high of $2,165,005 on July 9, 1965. During the taxable years here involved, petitioner did not extend a personal loan to any shareholder. During the taxable years here involved petitioner did not make any expenditure of funds for the personal benefit of its shareholders, other than the distribution of dividends. The following schedule reflects petitioner's taxable income per return, its net earnings after taxes per its books, and dividends paid as of August 31, for each of the years indicated: (rounded to the nearest dollar) Net
Taxable
Earnings
Divi-
Taxable
Income
After Taxes
dends
Year
Per Return
Per Books
Paid
1952
$ 176,480
$ 87,946
$ 87,500
1953
340,201
168,848
96,250
1954
197,930
101,193
52,500
1955
$ 166,622
$ 85,481
$ 70,000
1956
398,513
200,196
78,750
1957
235,263
118,456
78,750
1958
(70,720)
(71,299)
43,7 50
1959
(71,956)
(73,181)
17,500
1960
569,412
280,043
70,000
1961
269,353
136,782
70,000
1962
105,887
70,072
43,750
1963
153,220
79,570
26,250
1964
738,384
[1] 481,919
66,500
1965
1,012,833
[2] 600,348
105,000
1966
1,051,342
629,914
140,000
1967
1,441,311
881,964
175,000
*244 The following schedule reflects taxable income of petitioner and of its wholly-owned subsidiary, Monroe Mills, Inc., and consolidated taxable income per return and consolidated net earnings after taxes per books and dividends paid during the years indicated: (amounts rounded to the nearest dollar) Consolidated
Taxable
Taxable
Consolidated
Net
Income of
Income of
Taxable
Earnings
Taxable
Petitioner
Monroe
Income
After Taxes
Dividends
Mills
Year
Per Return
Per Return
Per Return
Per Books
Paid
1968
$616,424
[410,552)
$204,637
$224,247
$192,500
1969
858,612
(455,177)
403,435
229,798
140,000
1970
984,554
(310,802)
673,752
309,432
140,000 The following schedule is an analysis of petitioner's earned surplus for the taxable years ended August 31, 1959, to August 31, 1967, inclusive: F.Y.E.
F.Y.E.
F.Y.E.
8/31/59
8/31/60
8/31/61
Earned Surplus - Beginning balance
$2,660,546.28
$2,631,106.11
$2,839,985.20
Taxable income
(71,955.54)
569,411.09
269,352.71
Reduction of pension reserve
9,181.12
17,149.17
Dividends paid
(17,500.00)
(70,000.00)
(70,000.00)
Income taxes
(290,594.23)
(134,309.72)
Debits to Surplus (Sundry)
(10,394.82)
Federal tax refund Municipal bond
1,739.10
interest
State income taxes Investment
credit - 1962 write-off
Sundry credits
$ 61,240.40
Excise contributions
(1,225.03)
$ 1,225.03
Ending Surplus Balances
$2,631,106.11
$2,839,934.30
$2,923,866.46
*245 F.Y.E.
F.Y.E.
8/31/62
8/ 1/63
Earned Surplus - Beginning balance
$2,923,866.46
$2,942,832.88
Taxable income
105,886.81
153,219.70
Reduction of pension reserve
6,347.96
5,663.70
Dividends paid
(43,750.00)
(26,250.00)
Income taxes
(49,578.35)
(73,670.93)
Debits to Surplus (Sundry)
(4,660.70)
Federal tax refund Municipal bond
interest
State income taxes Investment
credit - 1962 write-off
Sundry credits
Excise contributions
Ending Surplus Balances
$2,942,832.88
$2,997,134.65 81 F.Y.E.
F.Y.E.
F.Y.E.
F.Y.E.
8/31/64
8/31/65
8/31/66
8/31/67
Earned Surplus -
$2,997,134.65
$3,418,576.81
$3,917,092.87
$4,416,305.75
Beginning balance
Taxable income
738,437.90
1,014,475.35
1,059,593.58
1,447,798.58
Reduction of pension
6,023.45
3,167.80
9,299.16
1,653.10
reserve
Dividends paid
(66,500.00)
(105,000.00)
(140,000.00)
(175,000.00)
Income taxes
(261,751.72)
(451,240.00)
(477,000.00)
(600,000.00)
Debits to Surplus
(18,344.53)
(Sundry)
Federal tax refund
(1,214.19)
Municipal bond
6,446.72
36,073.49
48,142.56
50,665.97
interest
State income taxes
(1,183.32)
(822.42)
1,843.57
Investment credit -
2,222.74
1962 write-off
Sundry credits Excise
contributions
Ending Surplus
$3,418,576.81
$3,917,092.87
$4,416,305.75
$5,124,922.44
Balances
*246 George W. Felker, III (hereinafter referred to as Felker), petitioner's president, treasurer and chief executive officer during the taxable years in issue, was graduated from Georgia Institute of Technology with a Bachelor of Science degree in textile engineering in 1936 and has been in the textile industry all of his adult life with the exception of a 5-year leave of absence while in the United States Army during World War II. Hansford Sams, Jr. has been a director of petitioner since 1960. His principal occupation was (and is presently) president of Whittier Mills Company, located in Fulton County, Georgia, and executive vice-president of Scottdale Mills, located in DeKalb County, Georgia. He is a graduate of Georgia Institute of Technology with a Bachelor of Science degree in textile engineering, and has been employed in the textile industry since his graduation in 1936. Robert S. Sams is secretary of petitioner. He has been employed by petitioner in various administrative capacities since 1943, and is in charge of accounting and general administration. Warfield first became a director of petitioner in 1942. He was a practicing architect and engineer in Nashville, Tennessee, *247 and is now retired. During 1966 and 1967 the vacancy created on the board of directors by Tichenor's death had not been filled. The officers of petitioner from the time Felker was employed in 1962 through the years in issue were as follows: Henry McD. Tichenor
Chairman of the Board (until his death in 1965)
George W. Felker III
President and Treasurer
Dan R. Melton
Plant Manager
William H. Glaefke
Vice President
Robert S. Sams
Secretary
Though Felker had been asked to become petitioner's president as early as 1953, he had declined and the matter was left open. Felker's decision to become president was motivated by his feeling that petitioner's operation was not realizing its full potential and his personal desire to leave the New York area, having lived there for over 15 years. During the years here in issue petitioner carried accounts receivable of varying amounts. In general, these accounts receivable consisted of petitioner's invoices for products sold to petitioner's customers. The normal credit terms on sales made by petitioner to its customers during these years were "net amount of the invoice in ten days." During the years in issue, petitioner *248 had a commission-agent relationship with Avondale Mills, Inc. (hereinafter referred to as Avondale). Avondale sold petitioner's products and received a commission on net invoices rendered. Invoices rendered by petitioner for merchandise sold for it by Avondale were payable in 10 days. Avondale guaranteed payment of petitioner's accounts receivable. After 10 days, Avondale assumed all credit risks. Part of the commission paid Avondale was in 82 consideration for assuming the risk of collecting. Avondale made remittances to petitioner on the 10th, 20th, and 30th of each month. Invoices billed by petitioner on the first day of the month would be paid by Avondale on the tenth. Invoices rendered by petitioner on the second day of the month would be paid by Avondale on the twentieth. As part of its operation requirements, petitioner maintained inventories which included raw materials, work-in-process, finished goods, and supplies and repair parts. Inventory size was affected by the market for petitioner's product at the time and the prevailing policy relative to acquiring raw material (cotton) in advance of consumption needs. The closing inventory for the fiscal year 1963 was approximately *249 $1,145,000 and the closing inventories for the years in issue were approximately $501,000, $787,000, $760,000 and $877,000, respectively. The larger inventory as of the close of the fiscal year 1963 as compared to the close of the fiscal year 1964 was caused primarily by the fact that petitioner knew in 1964 that the Federal Government's support price on cotton was coming down, pursuant to new legislation designed to achieve "one-price cotton," and petitioner wanted to have as little cotton on hand as possible so as to be able to buy a maximum amount of the lower priced cotton. Moreover, as a general rule during the years in issue, petitioner's inventories varied from month to month. Petitioner maintained trade accounts payable in various amounts during the years in issue. Generally, these accounts consisted almost entirely of invoices for cotton and machinery. As to trade purchases, there were no standard credit terms. In general, trade invoices were either payable upon receipt or within 10 to 30 days. There were no long-term credit terms available. Petitioner's policy regarding payment of its trade accounts was to pay very promptly in order to maintain a good credit standing. In *250 the case of purchases of cotton, its policy was to pay on the same day the cotton was received. During the years in issue and preceding years, petitioner maintained a line of credit of approximately $500,000 with one bank, which was used from time to time to finance inventories. Petitioner's traditional policy was to use very little borrowed money and to operate primarily out of internally generated funds. During the years in issue, it had no debt for borrowed money. The average operating cycle of petitioner during the years in issue was approximately 79 days. The term "operating cycle" includes the period of time required by petitioner to convert raw materials into finished goods, to sell such goods, and to collect the sales proceeds. During the years in issue, petitioner needed working capital, primarily for (a) its weekly payroll, (b) purchase of raw materials, and (c) payment of general operating expenses as they became due. Petitioner's business as a primary producer of yarn and fabrics is historically cyclical in nature and a large part of petitioner's operating costs is relatively fixed. Certain of its costs of production are not subject to substantial short-term adjustment *251 even if sales diminish because of the necessity for petitioner (a) to maintain its labor force by providing regular employment, (b) to buy cotton when it is available for purchase on advantageous terms, and (c) to operate at a level of production somewhere close to capacity in order to achieve reasonable efficiency and low unit cost. Petitioner's working capital requirements for one operating cycle of 79 days calculated for "peak" (as distinguished from "average") periods in the years in issue would be as follows: Taxable year
ended
August 31
Amount
1964
$1,406,943
1965
1,407,449
1966
1,474,874
1967
1,395,361 At the beginning of the first taxable year in issue petitioner's current assets exceeded its current liabilities by $1,947,287.70, with a current ratio of 9.88 to 1. When Felker became president of petitioner in 1962 an evaluation of petitioner's product line and a decision to upgrade the product line was made in order to permit petitioner to become a supplier to converters of apparel fabrics. This in turn would require that petitioner build a new plant or modernize its existing facility. Prior to 1963, petitioner's officers, in particular Felker, *252 Tichenor, and Dan R. Melton (hereinafter referred to as Melton), petitioner's plant manager, considered and discussed the building of a new plant on land which was already owned by petitioner and which lay immediately south of the existing plant site. In 1963 the structural condition of petitioner's plant was sound, but the building 83 was in need of repair and improvements (e.g., flooring, roofing, lighting and airconditioning). In 1963, a decision was made by petitioner's officers to improve and modernize the existing plant rather than build a new one. It was the objective of petitioner to achieve a program of modernization without shutting down its plant or curtailing its production. To achieve this result petitioner's management concluded that the modernization of its plant and equipment would have to proceed on a step-by-step basis. Discussions concerning petitioner's modernization program among petitioner's management and directors took place on an informal day-to-day basis. However, the discussions, or substance thereof, were not reflected in petitioner's minutes. Petitioner's average annual expenditures for capital improvements for the 10 years prior to 1963 was $159,377 *253 while its average annual depreciation for the same period was $163,975. The following is a statement of petitioner's expenditures for capital improvements for the taxable years 1963 to 1967, inclusive (rounded to the nearest thousand dollars): Taxable year
Expenditures
ended
for capital
August 31
improvements
1963
$ 39,000
1964
390,000
1965
400,000
1966
341,000
1967
1,216,000 The following is a statement of petitioner's and its subsidiary's (Monroe Mills, Inc.) expenditures for capital improvements for the taxable years 1968 to 1970, inclusive (rounded to the nearest thousand dollars): Taxable year
ended
Walton
Monroe
August 31
Mill, Inc.
Mills, Inc.
Total
1968
$624,360
[1] $304,327
$928,687
1969
336,288
390,499
726,787
1970
95,156
605,094
700,250
In the spring of 1962 petitioner consulted with Saco-Lowell Textile Machinery Division (Saco-Lowell) with respect to the purchase of new roving frames. By letter dated March 21, 1962, Saco-Lowell submitted to petitioner a proposal for petitioner to buy 10 Saco-Lowell Rovermatic roving frames at *254 a total cost of $279,435. This proposal was rejected by petitioner. On May 28, 1962, Saco-Lowell submitted a second proposal whereby petitioner would obtain one such Rovermatic roving frame on loan for demonstration and testing purposes. Petitioner accepted this second proposal, and experimented with the demonstration model for approximately 2 years after which time it concluded that the Saco-Lowell Rovermatic machine was not satisfactory. In the latter part of 1962 the roof over the weaving department of petitioner's plant was in need of replacement or repair. The insulation of the roof had rotted and it leaked. The area of the roof is approximately 41,000 square feet. In the early part of 1963, a detailed study of petitioner's roofing needs was conducted by J.E. Sirrine Company. Cost estimates indicated that repair of the roof would cost in excess of $30,000. A second study was subsequently conducted by Parks-Cramer Company to consider alternative proposals with respect to petitioner's roofing needs. In 1964, a new roof was installed by Ledbetter Roofing Company at a total cost to petitioner of $29,734. In 1963 petitioner revamped its opening and cleaning process and purchased *255 new cleaning machines and cotton feeders. The opening and cleaning equipment was purchased from Saco-Lowell Shops, Easley, South Carolina, in October 1963 at a total cost of $66,850.65. In 1963 petitioner learned that Whitin Machine Works (Whitin) had developed a new roving frame, and on November 8, 1963, petitioner obtained a demonstration model for testing purposes. In April 1964, petitioner contracted to purchase nine roving frames from Whitin. The cost of these frames, together with related equipment, was $213,164. In June of 1964, representatives of Davidson and Shepard, consulting engineers, visited petitioner's plant, studied the plant, and conferred with petitioner's management personnel, including Felker and Melton, in connection with the possible refrigeration (air conditioning) of petitioner's plant On August 28, 1964, Davidson and Shepard submitted a report of their study regarding the proposed refrigeration of petitioner's plant. A subsequent report was submitted by Davidson and Shepard on September 9, 1964. The refrigeration of petitioner's plant was completed in June 1965 at a total cost of $303,479.71. In 1965 a special purpose building was constructed for the purpose *256 of housing air-conditioning equipment. This building was listed on petitioner's income 84 tax returns along with its other buildings and depreciated at the rate of depreciation used for other buildings. The air-conditioning equipment was listed with "manufacturing machinery" on petitioner's depreciation schedules on its returns and depreciated at the rate applicable to machinery. On February 25, 1965, Dan R. Melton submitted a memorandum to George W. Felker which had been requested by Felker setting forth nine reasons why petitioner should not purchase new spinning equipment. Reasons cited by Melton against the purchase were, among others, the large capital outlay, yarn then produced was satisfactory, improvements could be made in drafting systems on present spinning equipment, advantage of a larger package could be achieved to a large degree by changing present spinning to accommodate a larger ring and a longer bobbin and possible development of a practical cop feeder. At the time the memorandum was submitted, petitioner had made no commitment to purchase new spinning equipment. The minutes of petitioner's board of directors meeting held on March 17, 1966, indicate that replacement *257 of spinning equipment was considered. The management was to proceed to make a commitment for the purchase of new spinning equipment if such could be justified. On December 9, 1965, Roberts Company, Sanford, North Carolina submitted a proposal for petitioner to purchase Arrow spinning frames. Saco-Lowell made a study of petitioner's requirements and submitted two proposals, dated April 5, 1966, and April 11, 1966. In addition, Melton received correspondence dated March 17, 1966, March 30, 1966, April 11, 1966, and April 22, 1966, from Whitin concerning Whitin's proposals with respect to petitioner's spinning requirements. On May 12, 1966, petitioner entered into a contract for the purchase of 74 spinning frames from Roberts Company. The total cost of the spinning frames, together with related items, was $1,115,408.22, detailed as follows: Spinning frames
$ 918,566.86
Clocks on frames
902.12
Bobbins
18,180.04
Wiring
36,036.31
Walton Mill labor
46,866.46
Compressed air supply
494.66
New flooring
29,030.37
Lighting for second spinning room
2,438.53
Cleaning equipment system
10,779.87
Later Roberts Company invoice on original contract
$ 10,881.18
Building modification
2,585.25
Winder modification to handle new spinning bobbins
26,767.63
Removal of old spinning machines
11,878.94
$1,115,408.22
*258 In March 1966 petitioner purchased new high-speed drawing frames and related equipment at a total cost to petitioner of $123,647.58. During the period between April 1964 and May 1967 petitioner installed new lighting equipment throughout the plant in accordance with the following installation and cost schedule: April 1964:
Weave room
$16,464.71
August-December 1965:
Spinning room
24,256.55
May-October 1966:
Card room
22,044.79
May-July 1967:
Preparation room
18,365.71
$81,131.76
By 1967, petitioner's entire yarn manufacturing process had been improved and modernized. Consideration has been given to modernizing petitioner's weaving process. Petitioner estimates the cost of a new weaving room building will be approximately $1,000,000 and that new weaving looms will cost a minimum of $1,750.000. As of the date of trial, petitioner had not purchased any new weaving equipment and had not commenced with construction of a new building to house the weave room. However, as an interim measure, petitioner did modify 130 of its old looms to increase their width to 50 inches in 1969. In December 1959 or January 1960, Felker had discussed with Tichenor the *259 desirability of petitioner's acquiring another mill and becoming a two-mill operation.In Felker's opinion a two-mill operation was a more efficient and economical operation than a one-mill operation. At that time Felker and Tichenor had discussed acquisition of Monroe Cotton Mills, Inc., with the executor of the estate of the majority stockholder but no agreement was reached. However, in late 1962 Monroe was considering disposition of its properties. Monroe was organized pursuant to the laws of the State of Georgia with its principal place of business in Monroe, Georgia. Its plant was located in close proximity to petitioner's plant. Monroe, 85 like petitioner, was a primary producer of cotton fabrics, but had a product line which was not competitive with that of petitioner. Petitioner makes fabrics from coarse yarns, whereas Monroe had traditionally made fabrics from medium yarns, which, generally speaking, are sold for different end uses from the uses made of fabrics from petitioner's yarn. Approximately 75 percent of the outstanding stock of Monroe was owned in 1962 by the Estate of Charles Walker, and it was the executor of the Estate of Charles Walker and also the president *260 of Monroe with whom Felker and Tichenor had previously discussed the possible acquisition of Monroe. At a meeting held December 21, 1962, the board of directors of petitioner authorized its officers to explore the possibility of acquiring Monroe and to work out a proposal that could be presented to petitioner's stockholders for approval. In early January 1963 Felker made an offer to purchase Monroe for $1,000,000 in cash. The offer was rejected. Petitioner's cash position at the end of 1962 was such that it would have been necessary for it to borrow money to finance the purchase of Monroe had its offer been accepted. In the spring of 1963, Monroe sold its land, buildings and machinery to the William L. Barrell Company (Barrell), controlled by Ben Comer (Comer) and sold its inventory, work in process, and accounts receivable to the Wellman Operation Corporation (Wellman), controlled by the family of Floyd Jefferson. Barrell then leased the land, buildings, and machinery to Wellman, and Wellman continued the operations of Monroe. The lease to Wellman was for a period of 5 years and while petitioner's management and directors were aware of the terms of the lease between Barrell *261 and Wellman, they did not regard the transaction as bringing to an end the possible acquisition of Monroe by petitioner. Barrell was controlled by Comer, who was president and chief executive of Comer Machinery Company, which was a dealer in secondhand textile machinery. Comer had a history of buying and selling mills and was not known in the textile industry as a mill operator, but rather as a dealer in used textile machinery, and as a "liquidator" of mills. At the meeting of petitioner's board of directors held on March 15, 1963, Tichenor and Felker reported on the sale of Monroe and indicated that in their opinion the new ownership of Monroe would not present a problem to petitioner and that good relations would continue between the companies. Immediately prior to July 1, 1965, a new corporation known as Monroe Mills, Inc., was formed pursuant to the laws of the State of Georgia. The common voting stock of Monroe Mills, Inc., was owned 51 percent by Buck Creek Industries, Inc. (Buck Creek) and 49 percent by Barrell. Buck Creek was controlled by Fred Phillips (Phillips). On July 12, 1965, Monroe Mills, Inc., purchased from Barrell all the property of Monroe previously leased *262 to Wellman. Barrell in April 1965, had contracted with Wellman for cancellation of the lease. Monroe Mills, Inc., also purchased all inventories. Shortly after the purchase on July 12, 1965, Felker became aware of the transaction. However, Felker continued to be optimistic that petitioner would be able to acquire Monroe in the future. In connection with the purchase by Monroe Mills, Inc., of the property owned by Barrell which had been leased to Wellman, certain restrictions were placed on the stock of Monroe. Barrell and Buck Creek agreed that if either party desired to sell its shares, the company would first have 30 days to accept the offer. If Monroe did not purchase the shares, then the remaining stockholder had a right of first refusal before the shares could be offered to a third party. On August 16, 1965, Felker was contacted by L. H. Morrison with respect to Jordan Mills, Inc., being offered for sale. Felker discussed the possible acquisition of Jordan Mills, Inc., with Comer and subsequently decided that petitioner would not be interested in pursuing such an acquisition. During the summer of 1966, Felker learned about Habersham Mills, Inc., from Hugh Spalding, Sr. (Spalding), *263 who controlled an interest in Habersham Mills. Spalding was a partner in the law firm of King and Spalding which represented petitioner. Felker became interested in Habersham Mills and believed that a block of shares owned by Callaway Mills Company could be purchased. He felt that if petitioner could acquire the stock owned by Callaway Mills, that the Spalding interest would welcome petitioner as a co-stock-holder and that the two companies might be combined in some way. At the meeting 86of petitioner's board of directors held on December 16, 1966, petitioner's management was directed to investigate the possibility of the purchase of a substantial amount of the capital stock in Habersham Mills and a subsequent merger of Habersham into petitioner. In February 1967, petitioner made an offer to purchase approximately 31 percent of the common stock of Habersham Mills for $951,000, but its offer was rejected. On September 8, 1967, after more than a year of negotiations, petitioner made an offer to purchase substantially all of the stock of Habersham Mills for $3,500,000. That offer was likewise rejected. Petitioner planned to borrow funds to finance a part of the acquisition and to *264 use accumulated earnings to finance the remaining portion of the $3,500,000. In July 1967 Felker was advised by Raymond T. Hirsch of Francis I. DuPont and Company that Rayonese Textile Company, Ltd., located in Montreal, Canada was for sale. Felker visited Montreal and inspected the property but decided that it was not a logical acquisition by petitioner. In March 1967 Felker again discussed the possibility of petitioner's acquisition of Monroe with Ben Comer. Felker discussed the matter with petitioner's board of directors at a meeting held on April 3, 1967, and was authorized to continue to negotiate in an effort to purchase Monroe. On September 15, 1967, Felker and Robert S. Sams met with Fred Phillips of Buck Creek to discuss petitioner's acquisition of Monroe Mills, Inc. On January 5, 1968, petitioner's board of directors authorized Felker to negotiate the purchase of all of the outstanding shares of Monroe Mills, Inc., for $1,000,000, subject to adjustment for contingencies. On January 17, 1968, petitioner purchased all of the outstanding stock of Monroe Mills, Inc., for a total price of $1,000,000 of which $900,000 was paid on that date to the sellers. The remaining *265 $100,000 was placed in escrow to be held until certain contingencies were determined. Subsequently on March 7, 1969, petitioner received $48,631 of this escrow fund, reducing the total cost of the Monroe stock to $951,369. At the time it was acquired by petitioner, Monroe was in need of additional funds for working capital and for modernization of its equipment. By February 1968 Monroe had borrowed $475,000 from banks and $275,000 from petitioner. By October 31, 1968, Monroe's total indebtedness was $2,200,000 of which $1,700,000 was owed to the First National Bank of Atlanta and $500,000 was owed to petitioner. On April 16, 1966, petitioner was contacted by Revenue Agent Johnny B. Hyers with respect to the conducting of an audit of the taxable years 1964 and 1965. The audit was actually commenced on May 2, 1966. Petitioner's taxable year 1966 was audited in June 1967. The minutes of the board of directors meeting held on June 10, 1966, disclose that the Internal Revenue Service proposed to assert the accumulated earnings tax against petitioner. The minutes then state: The President reported on the utilization of funds not currently required in the conduct of the business. *266 He stated that such funds will be available to pay invoices for plant improvements, for spinning and other machinery purchased as invoices come due and that no borrowing will be necessary. The possible acquisition of additional textile production facilities was discussed. The sense of the discussion was to encourage the management to explore such possibilities, with particular mention of a specific property, and to report later to the Board if an appropriate proposal can, in the opinion of management, be formulated. In his statutory notice of deficiency respondent determined that petitioner was liable for the accumulated earnings tax imposed by section 531 for each of the years in issue. Petitioner, by amended petition, claimed an overpayment of $2,007.19 for the taxable year ended August 31, 1965. Petitioner asserts that the overpayment results from its being entitled to an additional $2,007.19 of investment credit. Opinion Issue 1. Accumulated Earnings Section 531 of the Code imposes an accumulated earnings tax on corporations which section 532 makes subject to the tax. [2]
*267 87 Section 532 provides that every corporation "formed or availed of for the purpose" of avoiding the income tax as to its shareholders by permitting earnings and profits to accumulate rather than being divided or distributed shall be subject to the tax. Section 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of the purpose to avoid income tax of its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence; and section 537 defines the term "reasonable needs of the business" to include the "reasonably anticipated" needs of such business. Section 534 provides for circumstances in which the burden of proof regarding the reasonable needs of the business is placed on respondent. *268 In this case the Court denied petitioner's motion filed prior to the trial seeking a determination that the burden of proof was on respondent with respect to the grounds set forth in petitioner's statement described in section 534(a). Therefore, petitioner in this case has the burden of proof with respect to the reasonable needs of its business. Whether accumulations of earnings are beyond the reasonable needs of a taxpayer's business is essentially a factual question. Helvering v. National Grocery Co., 304 U.S. 282 (1938). The determination is made on the basis of the facts and circumstances existing in the year in issue and not by the events transpiring in subsequent years except to the extent that such events may throw a light upon the facts as they existed in the year in issue. Sterling Distributors, Inc. v. United States, 313 F. 2d 803, 807 (C.A. 5, 1963), and Dixie, Inc., 31 T.C. 415, 430 (1958), affirmed 88 277 F. 2d 526 *269 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960). The size of the accumulated earnings and profits is not determinative of the issue but rather, it is the reasonableness and the nature of the surplus which are the crucial factors, Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 500-501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960). Petitioner contends that the accumulations in the years in issue were (1) to meet working capital needs; (2) to finance a program of modernization of plant and equipment; and (3) to finance the acquisition of other mill property. Respondent contends that (1) petitioner's claimed working capital requirements are excessive, and (2) petitioner had no specific definite and feasible plans for modernization or expansion and therefore had no reasonably anticipated needs for the accumulations. Section 1.537-1(b) (1), Income Tax Regs.
Working Capital Respondent's regulations specifically provide that earnings and profits *270 may be retained to provide for the working capital requirements of the business. Section 1.537-2(b)(4), Income Tax Regs. Certain general "rules of thumb" have been used as an aid in determining whether a corporation's working capital was adequate to meet its reasonable needs. One rule of thumb which we have applied is that an accumulation of earnings to meet operating expenses for one year is reasonable. Goodman Furniture Co., 11 T.C. 530 (1948). Another rule of thumb which we have applied is that a ratio of current assets to current liabilities of approximately 2.5 to 1 is an indication that the accumulation of earnings and profits is not unreasonable John P. Scripps Newspapers, 44 T.C. 453, 471 (1965), and Bremerton Sun Publishing Co., 44 T.C. 566, 586 (1965). More recently this Court has applied the so-called Bardahl [3] formula which allows as reasonable an accumulation of earnings equal to the expected costs for a single "operating cycle." Magic Mart, Inc., 51 T.C. 775, 792 (1969), and Faber Cement Block Co., 50 T.C. 317, 331 (1968). However, the working capital requirements of various *271 businesses differ because of dissimilar economic environments and conditions, and therefore, any rule of thumb is no more than a rule of administrative convenience. Dixie, Inc. v. Commissioner, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960); and Barrow Manufacturing Co. v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817 (1962). In determining the working capital needs of a business, we must examine the nature of the business, the amount and rate of turnover of inventories, the amount and rate of collection of accounts receivable and similar relevant factors. See Barrow Manufacturing Co. v. Commissioner, supra.
We have set forth in our findings petitioner's working capital requirements for one operating cycle of 79 days, calculated for "peak" periods, for each of the taxable years in issue. Respondent, while conceding *272 the mathematical accuracy of the computation, argues that the "average" inventories and receivables approach should be used in lieu of the "peak" period approach. We do not agree. An examination of petitioner's cotton purchases and inventory policy, accounts receivable collection terms, and credit terms on accounts payable, as well as its line of credit reveals that the "peak" period approach is justified in this case and that the amounts set forth in our findings realistically represent petitioner's working capital requirements for one operating cycle. Magic Mart, Inc., supra at 793. Modernization Program Petitioner contends that accumulations of earnings and profits in the years in issue were required to finance a program of modernization of plant and equipment. Respondent argues that there was no specific, definite, and feasible plan of modernization, but that any consideration given to modernization by petitioner's officers was vague and uncertain and plans for the future use of the accumulations were indefinite. Respondent's regulations specifically provide that *273 reasonable accumulations of earnings and profits may be had to provide for bona fide expansion of business or replacement of plant. Section 1.537-2(b) (1), 89 Income Tax Regs. However, such grounds for reasonable accumulations of earnings and profits must satisfy the requirements of section 1.537-1(b)(1), Income Tax Regs., which provides in pertinent part: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. The regulations further provide that the requirement of a specific, definite and feasible plan does not necessitate the expenditure of accumulated earnings immediately, "nor must plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating *274 to the future needs of the business." Section 1.537-1(b) (1), Income Tax Regs.
We are satisfied on the basis of the record herein that petitioner had plans to modernize its plant and equipment prior to the close of the first taxable year here in issue. There is ample evidence in the record to support our conclusion that such a plan of modernization was well under way prior to May 2, 1966, when the examination of petitioner's tax liability by the revenue agent commenced. There was little documentation of petitioner's plans for modernization in the corporate minutes and formal memoranda since petitioner's management had daily contact and a history of acting in an informal manner. Under the facts here present, the lack of formal documentation is of little significance. John P. Scripps Newspapers, supra, at 469. See also Sterling Distributors, Inc. v. Commissioner, supra, at 807. Based on the testimony of George W. Felker III and other officers of petitioner and the fact that the record shows actual replacement of plant and equipment beginning prior to the first year here in issue, we conclude that during the years here in issue petitioner *275 had a "specific, definite, and feasible plan" of modernization. It is clear from the record before us that petitioner's modernization program was not an illusory one, nor was it a mere afterthought to justify the challenged accumulations. See Smoot Sand & Gravel Corporation v. Commissioner, supra, at 499. Expansion The acquisition of a business enterprise through purchasing stock or assets of another business is an acceptable ground for the reasonable accumulation of earnings. Section 1.537-2(b)(2), Income Tax Regs. Contemplated expansion must take the form of specific, definite, and feasible plans to justify the accumulation of earnings. The efforts of petitioner to expand its operation through the acquisition of other mill properties adequately set forth in our findings and needs no amplification. Petitioner's efforts to acquire Monroe Mills, Inc., were continuous and persistent and such efforts clearly antedate the taxable years in issue. It is also clear from the record that were petitioner able to acquire Monroe it would have to immediately *276 provide funds for additional working capital for Monroe and to modernize its equipment. In 1963 an effort was made to acquire the stock of Monroe Mills for $1,000,000 in cash - the very amount for which petitioner successfully acquired Monroe Mills in 1968. [4] As we observed in Faber Cement Block Co., supra at 333: Finally, we cannot and will not ignore the ultimate fruition of petitioner's expansion plans - accomplished within a reasonable time after the years in question at a cost closely in line with the amount originally estimated. While not controlling, evidence of what petitioner in fact did in subsequent years certainly affects the weight to be given its declared intention during the years in issue. Petitioner's efforts to acquire *277 Monroe Mills, together with its efforts in seeking other mill properties as alternatives, manifest a contemporaneous course of conduct directed toward fulfillment of its plans for expansion. Compare and contrast the proof of specific, definite, and feasible plans in The Dahlem Foundation v. United States, 405 F. 2d 993 (C.A. 6, 1969); Sterling Distributors, Inc., supra; Oklahoma Press Publishing Co. v. United States, 437 F. 2d 1275 (C.A. 10, 1971); and Henry Van Hummel, 90 Inc. v. Commissioner, 364 F. 2d 746 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 386 U.S. 956 (1967). Respondent argues that the record fails to show any clear testimony or evidence by way of minutes, financial statements, and feasibility studies that the ideas for expansion were in such stages of planning as would justify the accumulation of earnings by the petitioner. We do not agree. As we noted in Faber Cement Block Co., supra, at 332: We also recognize that petitioner's plans for expansion were not set forth in the minutes or other documentary material with precision or in detail. But *278 the requirement of "specific, definite, and feasible" plans does not demand that the taxpayer produce meticulously drawn, formal blueprints for action The test is a practical one, namely, that the contemplated expansion appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." * * * We are satisfied that petitioner's plans for expansion were sufficiently specific, definite, and feasible to meet the requirements of the regulations and the standards established in decided cases. Crawford County Printing and Publishing Co., 17 T.C. 1404 (1952); John P. Scripps Newspapers, supra; Bremerton Sun Publishing Co., supra; Faber Cement Block Co., supra. The record in this case amply demonstrates that petitioner needed its entire accumulated earnings in each of the years here in issue for the reasonable needs, including the reasonable anticipated needs of its business. Respondent contends that petitioner could have borrowed money for its expansion program as it *279 would have had to do because of lack of funds had its offer to purchase Monroe Mills in 1963 been accepted or had its offer made in 1967 to purchase the stock of Habersham for $3,500,000 been accepted. We reject this contention of respondent. Whether to accumulate funds to finance an acquisition or to borrow such funds is a judgment of management and the courts will not substitute their judgment for that of the responsible corporate officials when the record shows the existence of definite, specific, and feasible expansion plans, Crawford County Printing and Publishing Co., supra; Sterling Distributors, Inc., supra; and John P. Scripps Newspapers, supra. Petitioner's position that accumulations of earnings and profits were not beyond the reasonable needs of the business gains additional support from the fact that petitioner has had a good history of dividend payments, that there were no loans to shareholaers, and that there were no investments made in unrelated businesses. John P. Scripps Newspapers, supra, at 472. We are satisfied *280 that the portion of petitioner's earnings retained in each of the years in issue were retained by its management and directors in response to the needs of the business for working capital, modernization of plant and equipment, and expansion. We hold, upon consideration of all the evidence of record, that petitioner did not allow its earnings and profits to accumulate beyond the reasonable needs of its business in the years here in issue but that in each of the years here in issue all of petitioner's retained earnings and profits were retained for the reasonable needs of its business and constitute a part of the accumulated earnings credit under section 535(c) (1). For this reason petitioner had no income subject to the accumulated earnings tax and it becomes unnecessary for us to further discuss whether petitioner was availed of during the taxable years in issue for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate rather than being divided or distributed. John P. Scripps Newspapers, supra at 474. Issue 2. Investment Credit In 1965 petitioner constructed a special purpose building for the sole *281 purpose of housing equipment used in air-conditioning its plant. By amendment to its petition, petitioner seeks a refund of $2,007.19 for the fiscal year ended August 31, 1965, on the ground that the aforesaid building constituted "section 38 property" as defined in section 48 of the Code, and that petitioner is, therefore, entitled to an additional investment credit in the amount claimed. Ordinarily, buildings and structural components thereof do not qualify as section 38 property. However, the term, "building" does not include: (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined 91 with the machinery or equipment which it supports, houses or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. * * * Income Tax Regs., Sec. 1.48-1(e)
The record before us fails to demonstrate that the building in question comes within either of the exceptions set forth in respondent's *282 regulations. There is no showing that the special purpose building could serve no other purpose than to house the air-conditioning equipment and that it was so closely combined with the equipment it housed as to require that it be replaced, retired, or abandoned contemporaneously with the air-conditioning equipment. In fact, an examination of petitioner's return for the taxable year ended August 31, 1965, reveals that the special purpose building was depreciated together with the other "Mill Buildings," while the air-conditioning equipment was depreciated together with "Manufacturing Machinery." We therefore conclude that the building constructed by petitioner to house its airconditioning equipment is not section 38 property as defined by section 48(a) (1), and does not qualify for the investment credit provided for in section 38 of the Code. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
*. Reflected at cost and accrued interest which approximated market. ↩
**. Pledged as collateral to guarantee payment of mortgage loans on houses sold by Walton to employees.↩
1. Includes capital gains of $313,814. ↩
2. Includes capital gains of $52,580.↩
1. Represents expenditures from January 1, 1968, to August 31, 1968.↩
2. Secs. 531 through 535 and sec. 537, I.R.C. 1954, provide insofar as here pertinent: SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000 plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * * SEC. 535. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * * SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (totether with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * * SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus * * * the accumulated earnings credit (as defined in subsectition (c)). (b) Adjustments to Taxable Income. - For purposes of subsection (a), taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year. * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation * * * the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, * * * (2) Minimum credit. - The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. * * * SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonablee needs of the business" includes the reasonably anticipated needs of the business.↩
3. Bardahl Manufacturing Corp., T.C. Memo. 1965-200↩.
4. We note that, notwithstanding the fact that petitioner's initial efforts to acquire Monroe Mills were not successful, the sale of Monroe in 1963 was (in part) to a firm known to those in the textile industry as a "liquidator" and that petitioner's management had a reasonable basis to continue to expect that Monroe could be acquired by petitioner. Cf. Wellman Operating Corporation, 33 T.C. 162, 187-189↩ (1959).